#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **8:05CR318** |
| vs. | ) | |
| | ) | **REPORT AND** |
| **STEPHEN S. MOLSON,** | ) | **RECOMMENDATION** |
| | ) | |
| **Defendant.** | ) | |

This case is before the court on the defendant's MOTION TO SUPPRESS (#15). The motion was heard on November 28, 2005. The transcript of the hearing (#27) was filed on December 14, 2005, at which time the motion was deemed submitted.

The defendant moves for the suppression of evidence seized by the Nebraska State Patrol on July 11, 2005 following the stop of his motor home. Specifically, the defendant alleges the traffic stop of his motor home and the seizure of his person occurred without a warrant and absent reasonable, articulable suspicion of criminal activity or probable cause; that he was detained without reasonable and articulable suspicion of criminal activity or probable cause; that his consent to search his motor home was invalid; and that any statements he made were fruits of Fourth Amendment violations and were made absent a valid waiver of his *Miranda* rights.

The government counters that probable cause existed to stop the motor home and conduct routine activities related to that traffic stop, that the defendant consented to the search of his motor home, and that he voluntarily and knowingly waived his *Miranda* rights.

## FACTUAL BACKGROUND

Russell Lewis testified that he is a trooper with the Nebraska State Patrol and enforces traffic laws primarily on the interstate. On July 11, 2005 at approximately 12:51 A.M., while operating his cruiser eastbound on Interstate 80, his attention was drawn to a white and blue recreational RV type motor home because he did not see any license plates or temporary tags displayed on the vehicle (5:6-25). Because he did not observe plates, in-transits or temporary tags, he initiated a traffic stop and pulled the vehicle over (6:24-7:3).[1]

Lewis testified that after the stop he contacted the driver about half-way down the passenger side of the motor home.[2] The driver identified himself as Stephen Molson and provided a valid California operator's license (9:16-22). Lewis told Molson the reason for the stop[3] and Molson replied that he figured that was the reason (10:11-15). Molson gave

---

[1] Exhibit 15 is a recording made by Lewis' cruiser camera of the traffic stop, which fairly and accurately records the events shown (7:4-17). A review of the video shows the stop occurred at 12:51:22.

[2] Exhibit 1 is a view of the passenger side of the motor home. Exhibit 2 is a view of the driver's side. Exhibit 3 is a view of the front. Exhibit 4 is a view of the rear. Exhibit 5 is a view of the location where the license plate is to be affixed. Exhibit 6 is a picture of the front of the motor home showing a document issued by the California Department of Motor Vehicles which contains the vehicle VIN number (8:4-22).

[3] The court takes judicial notice of Neb. Rev. Stat. § 60-323 (Reissue 2004) (6:6-10) and Cal. Veh. Code § 4456 (65:2-9).
On the date defendant's vehicle was stopped, Neb. Rev. Stat. § 60-323 provided: "Except as otherwise specifically provided, no person shall operate, drive, or park or cause to be operated, driven, or parked a motor vehicle on the public highways unless such vehicle at all times has displayed one number plate on the back thereof and one number plate on the front thereof, which plates shall be furnished for it as hereinbefore provided." The Nebraska statute governing the display of license plates is now Neb. Rev. Stat. § 60-399, which became effective September 4, 2005
(continued...)

Lewis the vehicle's paperwork (10:16-19). Lewis testified that he first observed the document from California Department of Motor Vehicles affixed to the front window of the motor home (Ex. 6) after he contacted the driver, and was informed that the vehicle had just been purchased (9:3-8). As Lewis and Molson stood near the motor home's open passenger door, Lewis detected the odor of dryer sheets coming from the vehicle. This concerned Lewis because based upon his experience, when dryer sheets are in vehicles, many times narcotics are present as dryer sheets are used to mask the odor of the narcotics (10:24-11:7).

Lewis testified that he asked Molson to come back to his patrol unit so he could run a records check on the vehicle's VIN number and Molson's identification. While in the cruiser Lewis asked Molson basic questions about the vehicle and how it was purchased. Molson responded that he had purchased the motor home for $30,000 cash (11:23-12:8). Molson also told Lewis that he was traveling to Detroit, Michigan and then to Columbus, Ohio to visit his sister. He also told Lewis that there was a second occupant in the motor home, who he identified as Tiger Jones.

Lewis testified that, while waiting for the results of the records check, he asked Molson whether or not he had any prior drug charges and Molson stated, "No." (13:8-12).

---

[3](...continued)
pursuant to the Motor Vehicle Registration Act, L.B. 274 § 99 (2005).
   Cal. Veh. Code § 4456(c) provides:
      A vehicle displaying a copy of the report of sale may be operated without license plates or registration card until either of the following, whichever occurs first:
        (1) The license plates and registration card are received by the purchaser.
        (2) A six-month period, commencing with the date of sale of the vehicle, has expired.

Immediately after asking about drugs, Lewis noted that Molson began shifting around in the passenger seat complaining that he had gas and started moving his hands around (13:13-22). After receiving the record check, which included information that Molson had a drug conviction, Lewis asked Molson about the drug conviction. Molson explained that he had a "phone count" for talking about drugs over the phone, that the drug involved was marijuana, and that he used to smoke marijuana (14:1-6). Lewis asked Molson if there was marijuana in the motor home. Molson responded, "No." (14:7-11). Molson also informed Lewis that he had some spousal abuse charges and that he had been into machine guns when he was younger (14:15-19).

      Lewis testified that he then left Molson in the cruiser and contacted the passenger, Tiger Jones, who said he was en route to Columbus, Ohio to visit his aunt and that Molson was his uncle. During the conversation, Lewis again noticed the odor of dryer sheets coming from the motor home (16:4-12). After talking with Jones, Lewis returned to the cruiser and again talked with Molson, who stated that he was going to leave the motor home at his sister's house. Lewis believed this information was a conflict with what Molson had told him earlier – that he was not going to leave the motor home at his sister's (17:6-18). Lewis again asked Molson about his marijuana charge and informed Molson that the record check showed the charge was for harvesting and production of marijuana. At that time Lewis received a response to the record check on the motor home that the identification number was not on file (18:3–6). This concerned Lewis because it indicated that the motor home had not been

entered in the computer, that he had misread the VIN number, that the VIN number had been altered on the paperwork, or that there was some other reason the number was not in the computer. Lewis then rechecked the documents and noted that the motor home had been purchased on June 23rd, two weeks earlier. Finding the paperwork and insurance in order[4], he returned the documents to Molson (18:16-22).

Lewis testified that after he returned the paperwork, he asked Molson if there were any drugs in the vehicle and Molson responded, "only alcohol." Lewis then asked Molson if it was okay for him to get into the motor home and look (18:23-19:6). Lewis requested the consent because he was concerned about the odor of dryer sheets, Molson's behavior when asked about drugs, Molson's prior record, and his belief that Molson had changed his story about leaving the motor home with his sister (19:7-16). Lewis asked for permission to search at approximately 1:08 A.M.[5]

Lewis testified that at the time of the stop Molson was 39 years of age, had a 12th grade education, and was employed as a truck driver (20:2-15). Lewis noted that when he asked for permission to search, he made no threats or promises, that Molson did not appear to be under the influence of alcohol or drugs, and that Molson's answers to his questions were responsive (21:4-16).

---

[4]The Government and Molson have stipulated that the motor home properly displayed a report of sale on the front window (76:1-4).

[5]A review of Lewis' patrol car video (Ex. 15) shows the time as 1:08:24.

Lewis testified that he specifically asked Molson if it was okay if he went up and looked around to make sure there wasn't any marijuana; that Molson asked, in response, how long that was going to take, and Lewis informed him just a few minutes – just long enough for me to look around.  Molson replied, "if that's what you need to do" at which time Lewis, in an effort to clarify, asked permission to "get into the vehicle" and "if that was alright with Molson." Molson stated, "Yes."  Lewis and Molson exited the patrol unit and walked to the motor home where Molson told Jones, "Tiger, he wants to get up and look for some marijuana real quick" (22:1-14).  Lewis then asked Molson and Jones to stand in front of the motor home so that for officer safety he could see them through the front windshield as he conducted the search (22:25-23:6).

Lewis testified that at approximately 1:10 A.M., he entered the motor home and noticed an overwhelming odor of dryer sheets (23:14-20).  Lewis went immediately to the back bed, lifted up the mattress and observed numerous pillows, comforters, and bedding-type supplies.  Not seeing anything that appeared to be contraband, he shut the bed and looked in the bathroom.  Again finding nothing, he returned to the bed and tried to pinpoint where the odor of dryer sheets was coming from because he believed if he located the dryer sheets they would be near the drugs (26:13-27:7).  As he looked around the bed for the second time he saw the corner of a black duffle bag (27:10-13).  He picked up the bag noting that it was fairly heavy.  He opened the bag and observed bundles of what he believed was narcotics (29:5-7).  Lewis believes he opened the first bag at approximately 1:13 A.M.

(29:15:16), and after unzipping the bag, he turned around and saw Molson standing in the doorway watching him. He immediately told Molson to exit the vehicle and to get on the ground.[6] Molson complied (29:21-30:1). Lewis noted that Molson did not object to the search at any time (30:2-7). Lewis asked Molson what was in the bag. Molson responded that he did not know (30:18-22).

Lewis testified that at approximately 1:20 A.M., back-up arrived at the scene, Molson and Jones were handcuffed, and he advised Molson of his *Miranda* rights (31:17-32:19). Molson and Jones were then taken into custody by other officers and Lewis had no further contact with them.

Lewis testified on cross-examination that when he first came upon the motor home on Interstate 80, he overtook it from the rear and observed that it did not have any plates and that before stopping the motor home, he passed it and checked his rearview mirror to determine whether or not the motor home had any in-transit stickers on the front; however, because of the speed of his vehicle, approximately 75 mph and the headlights of the motor home shining in his rearview mirror, he was unable to see the in-transit sticker in the front window (36:14-37:6). Lewis also noted that he did not see the California in-transit sticker until after he had made contact with Molson and smelled the dryer sheets (40:23-41:8).

On cross-examination, Lewis testified that while talking with Molson his attention was piqued because he believed Molson contradicted himself about leaving the motor home

---

[6]A review of Lewis' patrol car video (Ex. 15) shows the time as 1:13:50.


with his sister, by Molson's change in demeanor almost immediately after being asked about his prior narcotics-related offense, and by the fact that he had paid cash for the motor home (47:5-48:6).

Brian Eades testified that he is an investigator with the Nebraska State Patrol where his general responsibilities include the investigation of violations of the criminal and narcotic statutes of the State of Nebraska. On July 11, 2005 at approximately 2:22 A.M., he interviewed Stephen Molson (67:6-8)[7] at the office of the Nebraska State Patrol. Eades noted Molson did not appear to be under the influence of alcohol, appeared coherent, and that no threats or promises were made during the interview (69:24-70:6).

Eades testified that he read Molson his rights using a *Miranda* rights advisory form (Ex. 18), that he read each right, asked Molson if he understood, and that Molson responded affirmatively to each of the rights and signed the form (72:11-15). Eades questioned Molson, during which time Molson indicated that he was not feeling well. Eades asked if there was anything that needed to be done and offered Molson medical attention. Molson responded that he didn't require medical attention (73:6-15). After questioning Molson for approximately 16-18 minutes, Molson stated that he needed an attorney, and Eades stopped the interview (73:20-74:8).

---

[7]Exhibit 17 is a videotape which fairly and accurately depicts Eades' contact with Molson (67:14-24).

## LEGAL ANALYSIS

### A.  Legality of Traffic Stop

"For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest." *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001); *see United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001), *cert. denied*, 537 U.S. 850 (2002).  As such, a traffic stop is governed by the principles of *Terry v. Ohio*, 392 U.S. 1 (1968).  *Jones*, 269 F.3d at 924.  Under *Terry,* 392 U.S. at 21-22, a police officer may conduct an investigative stop if the officer has a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity.  *See also Delaware v. Prouse*, 440 U.S. 648, 663 (1979).  Reasonable suspicion requires a particularized and objective basis for suspecting the person stopped of criminal activity, but the level of suspicion required for a *Terry* stop is less demanding than that for probable cause.  *United States v. Gonzalez*, 220 F.3d 922, 925 (8th Cir. 2000) (internal quotations and citations omitted).  "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality." *United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1998).  Even "[a] mistaken premise can furnish grounds for a *Terry* stop, if the officers do not know that it is mistaken and are reasonable in acting upon it."  *United States v. Ornelas-Ledesma*, 16 F.3d 714, 718 (7th Cir. 1994), *judgment vacated on other grounds*, 517 U.S. 690 (1996) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 184-86 (1990)); *accord United States v. Bailey*, 417 F.3d 873, 977 (8th Cir. 2005);

*see also United States v. DeLeon-Reyna*, 930 F.2d 396, 399 (5th Cir. 1991) (en banc) (per curiam); and *United States v. Walraven*, 892 F.2d 972, 974-75 (10th Cir. 1989)).

I conclude that Trooper Lewis had an objectively reasonable basis for believing a traffic offense had occurred. Any mistake of fact or mistake of law on his part, therefore, does not affect the validity of the traffic stop.

> Within the Eighth Circuit,
>
> the distinction between a mistake of law and a mistake of fact is irrelevant to the fourth amendment inquiry. As we held in *United States v. Sanders*, 196 F.3d 910, 913 & n.3 (8th Cir. 1999), the validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one. "The determination of whether probable cause [or reasonable suspicion] existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." *Id.* at 913.

*United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005); *see also United States v. Martin*, 411 F.3d 998, 1101 (8th Cir. 2005).

In this case, Trooper Lewis testified that he stopped Molson's motor home to determine if it had plates or permits as required by Neb. Rev. Stat. § 60-323. The reason for the stop is recorded on video. The videotape (Ex. 15) verifies Lewis' in-court testimony and there is nothing on the videotape that contradicts Lewis' testimony. I find Lewis' testimony to be credible. I further find that action in stopping defendant's vehicle for a violation of Neb. Rev. Stat. § 60-323 was objectively reasonable. If he made a mistake of fact or law in this instance, the mistake was an objectively reasonable one.

### B. Scope and Duration of the Traffic Stop

Having made a valid traffic stop, an officer is allowed to detain the occupants of the vehicle while completing "a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." *United States v. $404,905.00 in United States Currency*, 182 F.3d 643, 647 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000); *see also United States v. Barragan*, 379 F.3d 524, 528-29 (8th Cir. 2004). "During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered." 182 F.3d at 643; *see also United States v. White*, 81 F.3d 775, 778 (8th Cir.), *cert. denied*, 519 U.S. 1011 (1996); *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994), *cert. denied*, 514 U.S. 1134 (1995). "'An officer may also question a vehicle's passengers to verify information provided by the driver, and conflicting stories may provide justification to expand the scope of the stop and detain the occupants.'" *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2004) (quoting *United States v. Barragan*, 379 F.3d at 529); *see also United States v. Williams*, 2005 WL 3335070, No. 05-2158 (8th Cir., Dec. 9, 2005).

A review of the videotape (Ex. 15) reveals that in this case most of the routine tasks were accomplished in less than 18 minutes, after which Lewis returned Molson's documents and asked for permission to search the motor home.

-11-

I find that Molson was no longer "seized" within the meaning of the Fourth Amendment after Lewis returned his documents, and a reasonable person in Molson's position at the time Lewis asked for further conversation and permission to search would "feel free to terminate the encounter and be on his way." Lewis did not somehow re-seize Molson by asking him additional questions or by requesting his consent to search. *See United States v. Morgan*, 270 F.3d 625, 630 (8th Cir. 2001), *cert. denied*, 537 U.S. 849 (2002). Nothing in the record suggests that Lewis acted in such a way that a reasonable person would believe that he was not free to decline the request for further conversation or terminate the encounter altogether. *See id.* Thus, I find that the traffic stop of less than 18 minutes was not unlawfully expanded, and that the subsequent contact between Molson and Lewis was consensual. *See, e.g., United States v. White*, 81 F.3d at 779 (after defendant's license and registration were returned and the warning was issued, the encounter "became nothing more than a consensual encounter between a private citizen and a law enforcement officer"); *United States v. Santos-Garcia*, 313 F.3d 1073, 1078 (8th Cir. 2002) (defendant was no longer seized within the meaning of the Fourth Amendment after officer returned his identification and issued a warning ticket).

In the alternative, should the district court find that the continued contact was not consensual, I find that grounds for reasonable suspicion were generated in the course of the initial contact, which were sufficient to justify engaging Molson in conversation after the traffic stop concluded. An officer who develops a reasonable, articulable suspicion of

criminal activity may expand the scope of an inquiry beyond the original reason for the stop and detain a vehicle and its occupants for further investigation. *See United States v. Poulack*, 236 F.3d 932, 935-36 (8th Cir.), *cert. denied*, 534 U.S. 864 (2001)); *United States v. Barragan*, 379 F.3d at 529.

Whether an officer had reasonable suspicion to expand the scope of a stop is determined by examining the totality of the circumstances, in light of the officer's experience. *United States v. Sanchez*, 417 F.3d at 975. In this instance, the smell of dryer sheets in the motor home, Lewis' belief that Molson had changed his story about leaving the motor home with his sister, Molson's prior drug conviction, and Molson's change in demeanor when asked about marijuana, were grounds for reasonable suspicion which allowed Lewis to expand the scope of his initial inquiry.

### C.  Search of the Motor Home.

Police may conduct a search of someone's vehicle, home or person even without a warrant or probable cause if that person voluntarily consents to the search. *See, e.g., United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000); *United States v. Deanda*, 73 F.3d 825 (8th Cir. 1996). To determine whether such a consent was voluntary, the court must examine the totality of the circumstances, including the characteristics of the accused and the nature of the encounter. *See Bradley*, 234 F.3d at 366. The government has the burden of proving consent was voluntary. *United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, 511 U.S. 1077 (1994); *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir.), *cert. denied*, 516

U.S. 892 (1995).  "The prosecution need not prove that the individual was fully aware of his or her rights under the Fourth Amendment in order to establish a voluntary consent." *Heath*, 58 F.3d at 1275 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973)).  "Consent is voluntary 'if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied.'" *United States v. Fleck*, 413 F.3d 883 (8th Cir. 2005) (quoting *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990)).

The recorded conversation (Ex. 15) between Lewis and Molson generally corroborates Lewis' testimony and shows Molson's verbal consent to search.  The consent was not limited in any fashion, was not retracted, and was not the result of any threat, promise, or inducement.

Considering the *Chaidez* factors[8] in conjunction with the videotape and the hearing

---

[8]Courts in the Eighth Circuit generally consider the "*Chaidez* factors" to determine if consent was voluntary:

> "Characteristics of persons giving consent" which may be relevant to the question include: (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*Id*. at 381 (internal citations omitted). Characteristics of "the environment in which consent was given" include:

> whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*Id*. (internal citations omitted). The factors should not be applied mechanically, *id*., and no
(continued...)

testimony, I find that Molson voluntarily consented to the search of his motor home.

**D.  *Miranda.***

The protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), "are triggered only when a defendant is both in custody and being interrogated.  *United States v. Lawrence,* 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992).  'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....'  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence,* 952 F.2d at 1036...."  *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied,* 516 U.S. 1150 (1996) (parallel citations omitted); *see also United States v. Boyd*, 180 F.3d 967, 976-77 (8th Cir. 1999); *United States v. Head*, 407 F.3d 925, 929 (8th Cir. 2005).

"A *Miranda* warning must precede any custodial interrogation.  A custodial interrogation involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *United States v. Chamberlain*, 163 F.3d 499, 502 (8th Cir. 1999) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)).

The government bears the burden of proving by a preponderance of the evidence that, under the particular facts and circumstances of this case, the defendant's waiver of his

---

[8](...continued)
single factor is dispositive or controlling. *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir.1993).
*United States v. Bradley*, 234 F.3d at 366.

*Miranda* rights was "an intentional, voluntary, knowing, and intelligent relinquishment or abandonment of a known right or privilege." *United States v. Black Bear*, 422 F.3d 658, 663 (8th Cir. 2005). "To determine whether a waiver or a confession was voluntary, a court looks at the totality of the circumstances and must determine whether the individual's will was overborne." *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002). The court must examine both "'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.'" *Id.* (quoting *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992)).

> To state the obvious, "interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." ... [T]he fact that the tactics produced the intended result ... does not make [a] confession involuntary." ... In other words, "there is nothing inherently wrong with efforts to create a favorable climate for confession." ... "'[Q]uestioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.'" ... Nor will a promise of leniency, an "expressed disbelief in the statements of a suspect ..., or lie[s] to the accused about the evidence against him" necessarily render a confession involuntary.... Rather, the coercive conduct must be "such that the defendant's will was overborne and his capacity for self-determination critically impaired."

*United States v. Santos-Garcia*, 313 F.3d at 1079 (citations omitted).

Regarding the statements made at the Nebraska highway patrol headquarters, I find Molson was advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and that there is no evidence he did not understand the advice of rights. In this case Molson was in custody and was questioned by Eades. The records, including the videotape

-16-

(Ex. 15), clearly demonstrate that Molson, after being advised of his right, signed the advisory form and agreed to be interviewed. The record shows no evidence of threat, promise, or coercion. I find that Molson was advised of his *Miranda* rights, and that he freely, voluntarily, and intelligently waived his rights, and gave a statement.

## RECOMMENDATION

In summary, I find Lewis acted reasonably in stopping Molson's motor home. The traffic stop itself was completed in a reasonable amount of time (less than 18 minutes), and Molson's subsequent contact with Trooper Lewis was consensual. In the alternative, grounds for reasonable suspicion were generated in the course of the initial contact which were sufficient to justify engaging Molson in conversation after the traffic stop concluded. Molson voluntarily consented to the search of the motor home, and, after being advised of his *Miranda* rights, he freely, voluntarily, and intelligently waived his rights.

For these reasons,

**IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS (#15) be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED January 4, 2006.**

                **BY THE COURT:**

                **s/ F.A. Gossett**
                **United States Magistrate Judge**